**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

**No. 5:10-CV-00249-D**

| | | |
|---|---|---|
| CHARLES P. WILKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| WACHOVIA CORPORATION, | ) | |
| WACHOVIA BANK, NATIONAL | ) | |
| ASSOCIATION, AND WELLS FARGO & | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on Plaintiff's motion to remand for lack of diversity jurisdiction or, alternatively, to amend his complaint to add additional defendants and to remand [DE-9] and on Defendants' motion to dismiss various counts of the complaint [DE-14]. The parties have filed their respective responses and replies. [DE-18, 19, 20, 28 & 30.] Judge Dever has referred the matter to the undersigned, pursuant to 28 U.S.C. § 636(b)(1), for a memorandum and recommendation on the pending motions.

**STATEMENT OF THE CASE**

On May 25, 2010, Plaintiff filed a complaint in Wake County Superior Court alleging against Defendant various state law claims, including breach of fiduciary duty, fraud, negligence, conversion, and alternatively breach of contract, arising out of Defendants' management of Plaintiff's investment account. On June 16, 2010, Plaintiff filed an amended complaint in which he alleged his damages with greater particularity. On June 21, 2010, Defendants removed the action to this Court alleging diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). On July 14,

2010, Plaintiff filed the instant motion to remand pursuant to 28 U.S.C. § 1447(c) alleging a lack of complete diversity.  On July 29, 2010, Defendants filed the instant motion to dismiss alleging that Plaintiff's tort claims are not proper as they are not distinct from the breach of contract claims and that Plaintiff has failed to properly plead his constructive fraud and conversion claims.

## STATEMENT OF THE FACTS

These are the facts as alleged by Plaintiff, Charles P. Wilkins ("Wilkins"), in his Amended Complaint.  Wilkins resides in Wake County, North Carolina where he maintains an active law practice.  Am. Compl. ¶ 1, 12 [DE-7].  Through a series of stock transactions, beginning in 1978 when Wilkins inherited shares of common stock in First National Bank of Smithfield, Wilkins acquired a substantial equity interest in Royal Bank of Canada ("RBC").  *Id.* ¶ 13-16.  Between 1997 and 2000, Wilkins was advised by various brokerage firms, including Joseph Stevens and Company, Inc. ("Joseph Stevens").  *Id.* ¶ 19, 20.  In October of 1998, Wilkins began investing on margin with Joseph Stevens and opened a collateralized line of credit with First Union National Bank ("First Union") to fund the investments, which were predominately in technology stocks.  *Id.*  Wilkins's primary contact at First Union was Stephen Holloman ("Holloman").  *Id.* ¶ 21.  Prior to 1997, Wilkins's investments had been limited to his bank stock and local real estate, and he suffered substantial losses on his "tech stocks" when the market crashed in March of 2000, which resulted in Wilkins owing a substantial debt to First Union.  *Id.* ¶ 18-20.

In August of 2001, First Union and Wachovia merged, with Wachovia Corporation ("Wachovia") being the surviving entity.  *Id.* ¶ 23.  By June of 2007, Wilkins's RBC stock comprised the "vast majority" of his investment assets and almost all of those shares were

2

deposited with Wachovia. *Id*. ¶ 24. Wilkins contacted Holloman, who continued his employment with Wachovia after the First Union merger, to discuss how he could "safely and conservatively" increase the income being generated by his RBC stock, so that he could more quickly pay down his debt. *Id*. ¶ 23, 25. Holloman referred Wilkins to Timothy Nugent ("Nugent"), a senior vice-president and investment strategist in the Wealth Management Division of Wachovia, and to Jane Watson ("Watson"), a vice-president and trust advisor in the Trust Division of Wachovia. *Id*. ¶ 27. Holloman, Nugent, and Watson recommended that Wilkins implement a "covered call" or "call option" strategy (the "Option Strategy") using his RBC stock through a Wachovia trust account, which they assured him was a conservative approach. *Id*. ¶ 29. Wilkins's understanding from the information he received from Holloman, Nugent, and Watson was that his RBC stock was not at risk, because the Wachovia option traders could manage his account so that the options sold would not be exercised. *Id*. ¶ 33-37. Wilkins told Holloman, Nugent, and Watson that it was of great importance that his RBC stock not be sold because it had a low basis and its sale would create a significant tax liability. *Id*. ¶ 31.

On or about June 29, 2007, Wilkins entered into two agreements with Wachovia, an Investment Management Agreement ("IMA") and an Option Strategies Consent Form (collectively, the "Investment Agreements"), which authorized Wachovia to execute the Option Strategy. *Id*. ¶ 49. On July 17, 2007, Wilkins deposited 100,000 shares of his RBC stock into a trust account with Wachovia (the "Trust Account"). *Id*. ¶ 69. The Option Strategy resulted in net gains to Wilkins of $80,450 in 2007 and $155,061 in 2008. *Id*. ¶ 72. On September 5, 2008, Wilkins agreed to transfer an additional 100,000 shares of RBC stock to the Trust Account. *Id*. ¶ 76. However, 117,398 shares were actually transferred. *Id*.

3

On or about April 1, 2009, Plaintiff met with Wachovia's "agents" to discuss the Option Strategy and was informed that he had incurred year-to-date unrealized losses of $165,283. *Id.* ¶ 77. Between April 1, 2009 and May 15, 2009, the price of RBC stock increased considerably, causing the Trust Account to incur substantial losses of approximately $699,483 generated by the Option Strategy. *Id.* ¶ 81. On May 15, 2009, Wilkins met with Holloman and Watson, joined by telephone with Tony Montione, a portfolio manager with Wells Fargo's Wealth Management Division, and was informed that the Trust Account had realized $694,723 in losses. *Id.* ¶ 83, 86. Wilkins received assurances that these losses were "a short-term matter" that could be managed and that Holloman, Watson, and Montione were satisfied with the overall performance of the Option Strategy. *Id.* ¶ 87-88. Between May 15, 2009 and May 29, 2009, the Trust Account's losses increased to approximately $1,057,450. *Id.* ¶ 90. Wilkins did not become aware of those losses until July of 2009 when he received the June 2009 Trust Account statement. *Id.* ¶ 94.

On July 28, 2009, Wilkins met with Holloman, Watson, and Montione, as well as Greg Carr ("Carr"), Mort High ("High"), and Steve Young ("Young") who are employees of Defendants. *Id.* ¶ 97. Just prior to the meeting, Wilkins was informed by email that the Trust Account's year-to-date losses were approximately $2,000,000. *Id.* ¶ 98. During the meeting, Wilkins was informed that the Trust Account was overdrawn and that he owed Wachovia approximately $250,000, which included Wachovia's $16,029.94 quarterly management fee, in addition to the approximately $2,000,000 loss he had incurred. *Id.* ¶ 101, 111. Young advised Wilkins that, due to the rise in price of RBC stock, he could simply sell approximately 40,000 shares of his stock and pay off the Trust Account's debt. *Id.* ¶ 102.

By email on July 29, 2009, Montione proposed six scenarios for Wilkins to consider in order to manage the risk of further losses to the Trust Account, each of which required Wilkins

4

to liquidate a "substantial amount" of his RBC stock. *Id.* ¶ 118. On August 12, 2009, Wilkins borrowed $2,300,000 from Wachovia and placed the funds in the Trust Account in order to buy back unexpired call options, eliminating his risk of future losses, and to pay off the $250,000 overdraft on the Trust Account. *Id.* ¶ 136. Between 2007 and 2009, Wilkins paid Wachovia $110,051.28 in fees and lost approximately $2,300,000. *Id.* ¶ 139.

## DISCUSSION

### I. Plaintiff's Motion to Remand

Plaintiff contends that this case should be remanded, pursuant to 28 U.S.C. § 1447(c), because there is not complete diversity between the parties. In his amended complaint, Plaintiff alleged that he is a citizen of North Carolina, that Defendant Wachovia Corporation is a North Carolina corporation with its principal place of business in Charlotte, North Carolina, and that Defendant Wells Fargo & Company is a Delaware corporation with its principal place of business in California and is doing business in North Carolina. Pl.'s Am. Compl. ¶ 2-3. Plaintiff contends that Defendant Wachovia Bank, National Association is deemed to be a citizen of the state in which it is located, which is North Carolina, for purposes of determining whether diversity jurisdiction is proper. Pl.'s Memo. in Supp. at 1 [DE-11]. Defendants contend that the Wachovia Corporation and Wachovia Bank Defendants were merged into Wells Fargo & Company and Wells Fargo Bank, National Association, respectively, and that it is the citizenship of the Wells Fargo entities that is determinative of whether diversity exists between the parties. Def.s' Resp. at 1 [DE-18]. The Court agrees with Defendants and concludes that the parties are, in fact, diverse for purposes of federal court jurisdiction.

### a. Standard of Review

"If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). Generally, a federal court may exercise its jurisdiction over a matter that involves a federal question or where the amount in controversy exceeds $75,000 and is between citizens of different states. 28 U.S.C. §§ 1331, 1332(a). There appears to be no federal question asserted in this matter, and the sole basis alleged for federal jurisdiction is diversity of citizenship. There is no dispute that the amount in controversy exceeds $75,000. Therefore, the determinative issue is whether the parties are diverse in citizenship.

### b. Citizenship of Wells Fargo Entities, and not Wachovia Entities, is Relevant Inquiry for Purposes of Diversity

In December of 2008, Wachovia Corporation merged with Wells Fargo & Company, with Wells Fargo & Company being the surviving entity. Aff. of Donna M. Harris ¶ 3, Ex. A. In March of 2010, Wachovia Bank merged with Wells Fargo Bank, with Wells Fargo Bank being the surviving entity. *Id*. ¶ 3, Ex. B. The instant action was filed on May 25, 2010, approximately a year and a half after the first merger and two months after the second merger occurred. Plaintiff, in his amended complaint, has acknowledged the mergers between the Wachovia and Wells Fargo entities. Pl.'s Am. Compl. ¶ 2-3. Notwithstanding the mergers, Plaintiff contends that the Court should look to the citizenship of Wachovia Bank to determine whether diversity of citizenship exists. This approach is counter to North Carolina's corporate law on mergers.

Under North Carolina law, when a merger takes effect, only the surviving entity continues and the other merging entity ceases to exist. N.C. Gen. Stat. § 55-11-06. Furthermore, other courts have held that "[w]hen a civil action is filed after a merger takes place, the surviving

entity's domicile is determinative of jurisdiction." *Garand v. J.P. Morgan Chase Bank, N.A.*, No. 3:10-cv-0212-LRH-VPC, 2010 WL 2695666, at *1 (D. Nev. July 2, 2010) (citing *Meadows v. Bicrodyne Corporation*, 785 F.2d 670, 672 (9th Cir.1986); *Hoefferle Truck Sales, Inc. v. DivcoWayne*, 523 F.2d 548-49 (7th Cir.1975)). While the *Garand* case involved Nevada's corporate law on mergers, both Nevada and North Carolina follow the same rule, that only the surviving entity continues to exist. *Compare* Nev. Rev. Stat. § 92A.250(1)(a), *with* N.C. Gen. Stat. § 55-11-06(a)(1). At the time Plaintiff filed his complaint, the Wachovia entities ceased to exist due to their merger with the Wells Fargo entities. Accordingly, the citizenship of the Wachovia entities is not relevant for purposes of determining whether diversity jurisdiction exists, but rather it is the citizenship of the surviving Wells Fargo entities that is determinative.

### c. Wells Fargo Entities are not Citizens of North Carolina for Purposes of Diversity

Having determined that it is the citizenship of the Wells Fargo entities that is relevant to the diversity inquiry, the Court must now determine, in fact, the citizenship of Wells Fargo & Company and Wells Fargo Bank. The Supreme Court, in the case of *Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006), considered the citizenship of national banks for purposes of diversity jurisdiction in federal court. 546 U.S. at 306. The Court explained that a corporation, for diversity jurisdiction purposes, is deemed to be a citizen where incorporated or where its principal place of business is located and that because state banks are usually corporations, they "fit comfortably within this prescription." *Id.* However, the Court went on to recognize that a federally chartered bank is not chartered by any state, but by the Comptroller of the Currency of the U.S. Treasury and is, by statute, deemed a citizen of the state in which it is "located." *Id.*; 28 U.S.C. § 1328. The Court held that "a national bank, for § 1348 purposes, is a citizen of the state

7

in which its main office, as set forth in its articles of association, is located." 546 U.S. at 307.[1] The Court reasoned that if a national bank was a citizen of every state where it had a branch, "the access of a federally charted bank to a federal forum would be drastically curtailed in comparison to the access afforded state banks and other state-incorporated entities." *Id.*

Plaintiff and Defendants agree that Wells Fargo & Company is a Delaware Corporation with its principal place of business in California. Pl.'s Am. Compl. ¶ 3; Aff. of Donna M. Harris ¶ 3, Ex. A [DE-17]. Because a corporation is, for diversity jurisdiction purposes, deemed to be a citizen where incorporated or where its principal place of business is located, Wells Fargo & Company is a citizen of Delaware and California and not of North Carolina. Therefore, the citizenship of Wells Fargo & Company is diverse from the citizenship of Plaintiff.

With respect to Wells Fargo Bank, Plaintiff contends that it is a citizen of North Carolina because it filed a complaint on June 1, 2010 in Wake County Superior Court stating that its main office is located in Mecklenburg County, North Carolina. Pl.'s Supp. Mem. at 7-8 [DE-28]. Defendants contend that Wells Fargo Bank is a national banking association with its main office in Sioux Falls, South Dakota, Aff. of Donna M. Harris ¶ 3, Ex. B [DE-17], and that the statement that Wells Fargo Bank's main office is in North Carolina was attorney error, Def.s' Resp. to Pl.'s Supp. Mem. at 5-6 & Decl. of Claudia Reisch Clontz [DE-30], but that in any event it is Wells Fargo Bank's office of record with the Comptroller of the Currency that is determinative. The Supreme Court was clear on this point in *Wachovia Bank v. Schmidt* when it held that "a national bank, for § 1348 purposes, is a citizen of the state in which its main office, *as set forth in its*

---

[1] At least one court has read the Supreme Court's decision in *Wachovia Bank v. Schmidt* not to preclude an interpretation of 28 U.S.C. § 1328 whereby a national bank is a citizen of the state(s) where its main office and its principal place of business are located. *Saberi v. Wells Fargo Home Mortg.*, No. 10CV1985 DMS (BGS), 2011 WL 197860, at *2-3 (S.D. Cal. Jan. 20, 2011). However, the Court need not consider this question because neither Wells Fargo Bank's principal place of business, which is in California, nor its main office, which is in South Dakota, is in North Carolina.

*articles of association*, is located." 546 U.S. at 307 (emphasis added); *see Garand*, 2010 WL 2695666, at *1 ("[f]or purposes of jurisdiction, a national banking association is domiciled in the state designated in its articles of incorporation as the locus of its main office[].")  According to the Office of the Comptroller of the Currency, as of March 20, 2010, before this action was filed, and as of January 31, 2011, after this action was filed, Wells Fargo Bank's main office was in Sioux Falls, South Dakota.  Def.s' Resp., Aff. of Donna M. Harris, Ex. B [DE-17]; National Banks Active As of 1/31/2011, Office of the Comptroller of the Currency, http://www.occ.treas.gov/topics/licensing/national-bank-lists/index-national-bank-lists.html (follow "List of National Banks and Federal Branches and Agencies active as of 01/31/2011" link).

Wells Fargo Bank's erroneous filing on June 1, 2010, has no bearing on its citizenship for purposes of this action both because it was made after Plaintiff filed his complaint and because it did not change the bank's main office of record with the Comptroller of the Currency.  *See Schmidt*, 546 U.S. at 307 n.1; *Athena Automotive, Inc. v. DiGregorio*, 166 F.3d 288, 290 (4th Cir. 1999) ("Because jurisdiction attaches at the commencement of an action, even if the citizenship of the parties changes after the commencement of the action so as to destroy complete diversity, subject matter jurisdiction is not destroyed, and the federal court continues to have authority to decide the case.").  Accordingly, Wells Fargo Bank was a citizen of South Dakota, for the purpose of determining diversity jurisdiction, when Plaintiff filed his complaint and is, therefore, diverse in citizenship from Plaintiff.

    **d.  Conclusion**

The Court having concluded that complete diversity exists between the Plaintiff and Defendants, it is **RECOMMENDED** that Plaintiff's motion to remand for lack of diversity be **DENIED**.

## II. Plaintiff's Alternative Motion to Amend and to Remand

In the event the Court declines to remand this case for lack of diversity, Plaintiff proposed to amend his complaint to add four individual defendants, all citizens of North Carolina, and Wells Fargo Bank, National Association and to have the case remanded to state court. Plaintiff contends that fairness demands such a result because he relied on the filings of Wachovia Bank with the North Carolina Secretary of State in determining that it was a citizen of North Carolina and, had the Wachovia Bank merger been disclosed with the Secretary of State, he would have framed the complaint to include these defendants to assure access to his chosen forum, the North Carolina Business Court. The Court finds Plaintiff's argument to be without merit.

### a. Standard of Review

When, after removal, a Plaintiff seeks to add a nondiverse defendant whose joinder would destroy jurisdiction, the court may deny joinder or permit joinder and remand the case to state court. 28 U.S.C. § 1447(e). Whether or not to permit joinder is within the sound discretion of the district court, which should consider all relevant factors, including "the extent to which the purpose of the amendment is to defeat federal jurisdiction, whether the plaintiff has been dilatory in asking for amendment, whether the plaintiff will be significantly injured if amendment is not allowed, and any other factors bearing on the equities." *Mayes v. Rapoport*, 198 F.3d 457, 462-63 (4th Cir. 1999) (citations omitted).

### b. Joinder of Individual Defendants is not Appropriate

As to the first consideration, the extent to which the purpose of the amendment is to defeat federal jurisdiction, this appears to be the only purpose for joining these defendants. Plaintiff asserts that these proposed defendants were included in the initial drafts of his complaint, but were removed from the final version "in order to simplify the process and as an act of professional courtesy toward those individuals." Aff. of Charles P. Wilkins ¶ 5-6 [DE-10]. Plaintiff also asserts that had he known the ramifications of the Wachovia Bank and Wells Fargo Bank merger, he "would have named the four North Carolina citizens as individual defendants to ensure that we would have the opportunity for this case to he heard in the North Carolina Business Court." *Id*. at 7. Accordingly, the Court finds that the sole purpose of the proposed joinder is to avoid federal jurisdiction.

Next, although the Court finds that Plaintiff was not dilatory in seeking to add these defendants, this factor weighs against permitting joinder under the present circumstances. "[W]here, as here, a plaintiff seeks to add a nondiverse defendant immediately after removal but before any additional discovery has taken place, district courts should be wary that the amendment sought is for the specific purpose of avoiding federal jurisdiction." *Rapoport*, 198 F.3d at 463 (citation omitted). Again, the timing of Plaintiff's motion for joinder indicates that its sole purpose is to avoid federal jurisdiction.

As to the third factor, injury to the Plaintiff as a result of denying joinder, the Court finds that Plaintiff will not be significantly harmed. Because Plaintiff's only stated reason for joining these defendants is to destroy diversity, it appears to the Court that the only arguable harm to Plaintiff by denying joinder is that he will be deprived of his chosen forum, the North Carolina Business Court, which he characterizes as "expressly created for, and specializing in, complex corporate and commercial litigation such as this case." Pl.'s Mot. to Remand ¶ 26 [DE-9]. The

11

undersigned is confident that this United States District Court is competent to adjudicate this matter and that Plaintiff will not be significantly harmed by litigating his case in this Court.

Finally, as to the equities and Plaintiff's fairness argument, the Court is unconvinced that Plaintiff was unfairly misled by Wachovia Bank's filings with the North Carolina Secretary of State. Plaintiff contends that he relied on a filing with the North Carolina Secretary of State that indicated Wachovia Bank was a "Current-Active" corporation with its "Principal Office" in Charlotte, North Carolina, despite the fact that Plaintiff acknowledged in his amended complaint that Wachovia Bank had merged with Wells Fargo Bank. *See* Pl.'s Am. Compl. ¶ 3 ("Wells Fargo is a named Defendant based upon its ownership of Wachovia and Wachovia Bank, National Association . . . .") [DE-7]. More importantly, this Court has already determined, as a matter of law, that the records of the Comptroller of the Currency at the time the action is initiated, and not the records of the North Carolina Secretary of State, are determinative of where a national bank is a citizen for purposes of diversity jurisdiction. Therefore, Plaintiff looked to the wrong records for the wrong entity when making his diversity determination. Accordingly, the Court rejects Plaintiff's fairness argument.

### c. Conclusion

The Court having concluded that Plaintiff's sole purpose for joining additional defendants is to defeat diversity and that the equities weigh against joinder, it is **RECOMMENDED** that Plaintiff's motion to join additional defendants and to remand be **DENIED**. Additionally, adding Wells Fargo Bank as a defendant is unnecessary as Wachovia Bank is, in fact, Wells Fargo Bank. However, for the sake of clarity, it is further **RECOMMENDED** that the Clerk of Court amend the caption to substitute "Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association" for "Wachovia Bank, National Association."

### III.    Defendants' 12(b)(6) Motion to Dismiss

Defendants contend that the tort claims alleged by Plaintiff arise from breaches of a written contract between the parties and, therefore, are not cognizable as independent torts and should be dismissed.  With regard to Plaintiff's constructive fraud claim and conversion claims, Defendants contend that they were insufficiently pled.

#### a.  Standard of Review

The purpose of a 12(b)(6) motion for failure to state a claim upon which relief can be granted is to eliminate claims that are factually or legally insufficient.  Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ibid*.  "A court need not accept a complaint's legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement."  *Alfaro v. United States*, No. 5:09-CT-3073-D, 2011 WL 561320, at *1 (E.D.N.C. Feb. 8, 2011) (Dever, J.) (citing *Iqbal*, 129 S.Ct. at 1949-50; *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009)).  "Similarly, a court need not accept as true 'unwarranted inferences, unreasonable conclusions, or arguments.'"  *Id.* (quoting *Giarratano*, 521 F.3d at 302; *see* Iqbal, 129 S.Ct. at 1949-50).  "Furthermore, in analyzing a Rule 12(b)(6) motion to dismiss, a court may consider 'documents incorporated into the

13

complaint by reference, and matters of which a court may take judicial notice'" without

converting the motion into one for summary judgment. *Id*. (citing *Tellabs, Inc. v. Makor Issues

& Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

### b. Economic Loss Rule

Defendants first contend that each of Plaintiff's tort claims is barred by the economic loss

rule, which generally prohibits recovery in tort for claims arising in contract. *See Kelly v.

Georgia-Pacific LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009) (Dever, J.) ("[o]rdinarily, a

breach of contract does not give rise to a tort action by the promisee against the promisor.")

(quoting *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 240 S.E.2d 345, 350 (1978),

*rejected in part on other grounds by Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs.,

Inc.*, 328 S.E.2d 274 (1985)). "To pursue a tort claim and a breach of contract claim concerning

the same conduct, 'a plaintiff must allege a duty owed him by the defendant separate and distinct

from any duty owed under a contract.'" *Kelly*, 671 F. Supp. 2d at 791 (quoting *Vanwyk Textile

Sys., B.V. v. Zimmer Mach. Am., Inc.*, 994 F. Supp. 350, 362 (W.D.N.C. 1997)) (additional

citations omitted). "Moreover, North Carolina courts have 'carefully circumscribed' this

independent duty requirement." *Kelly*, 671 F. Supp. 2d at 791 (quoting *Strum v. Exxon Co.*, 15

F.3d 327, 331 (4th Cir.1994)). "In so doing, North Carolina courts have strived to keep tort and

contract law . . . within their separate spheres." *Kelly*, 671 F. Supp. 2d at 791 (citations omitted).

"Tortious conduct must be 'identifiable' and 'distinct from the primary breach of contract

claim,' and must be accompanied by sufficient aggravating circumstances." *ACS Partners, LLC

v. Americon Group, Inc.*, No. 3:09cv464-RJC-DSC, 2010 WL 883663, at * 7 (W.D.N.C. Mar. 5,

2010) (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th

Cir.1998) (other citations omitted)). "The alleged conduct must have an element of malice,

14

recklessness or some similarly culpable state of mind in order to justify an award of punitive damages." *ACS Partners, LLC*, 2010 WL 883663, at * 7 (citing *Strum*, 15 F.3d at 330-31). "The policy behind the 'independent tort' exception is to keep open-ended tort damages from distorting contractual relations in light of the fundamental difference between tort and contract claims." *ACS Partners, LLC*, 2010 WL 883663, at * 7 (quoting *Broussard*, 155 F.3d at 346).

There are generally four recognized, but nonexclusive, exceptions to the economic loss rule, under which North Carolina courts have held a promisor liable in tort for injury or damage resulting from the performance of his contract:

> (1) The injury, proximately caused by the promisor's negligent act or omission in the performance of his contract, was an injury to the person or property of someone other than the promisee . . . .

> (2) The injury, proximately caused by the promisor's negligent, or willful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee . . . .

> (3) The injury, proximately caused by the promisor's negligent, or willful, act or omission in the performance of his contract, was loss of or damage to the promisee's property, which was the subject of the contract, the promisor being charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm, as in the case of a common carrier, an innkeeper or other bailee . . . .

> (4) The injury so caused was a willful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor . . . .

*Fry Roofing*, 240 S.E.2d at 350-51. "Nonetheless, the North Carolina Supreme Court noted that it had never held that a 'tort action lies against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill.'" *Kelly*, 671 F. Supp. 2d at 791 (quoting *Fry Roofing*, 240 S.E.2d at 351). Accordingly, the Court must analyze each claim in light of the economic loss rule.

15

### i. Fiduciary Duty Claims (Counts I & XII)

Defendants contend that Plaintiff's fiduciary duty claims arise from the Investment Agreements between the parties and, therefore, are not independent torts distinct from a breach of contract claim. Plaintiff counters that the fiduciary relationship between the parties predated any contractual fiduciary relationship and that the common law and statutory fiduciary duties are broader that those owed under the Investment Agreements. The Court agrees that Plaintiff's claims for breach of fiduciary duty are not constrained by the terms of the Investment Agreements.

The Court has found no case on point decided under North Carolina law. However, the policy justifications for the economic loss rule do not support its application to the fiduciary duty claims in this case. As this Court recognized in *Kelly*, "The [economic loss] rule makes sense, in part, because parties to a contract do not thereby become each others' fiduciaries; [therefore,] they generally owe no special duty to one another beyond the terms of the contract." 671 F. Supp. 2d at 791 (citing *Broussard*, 155 F.3d at 347) (internal quotations omitted). In *Broussard*, a class action brought by a group of franchisees against franchisor Meineke, the Fourth Circuit found that the district court "erred by allowing plaintiffs to advance their claims for breach of fiduciary duty when there is no indication that North Carolina law would recognize the existence of a fiduciary relationship between franchisee and franchisor." 155 F.3d at 347. The present case before the Court is distinguishable from *Broussard*, because here there is an alleged basis for the fiduciary relationship independent of the contract.

In the present case, Plaintiff has alleged facts to support his claim of a fiduciary relationship between himself and his investment account advisors and managers, *see, e.g.,* Pl.'s Am. Compl. ¶¶ 18, 21, 32, 33 & 60, and North Carolina law has recognized a fiduciary duty

16

between such parties in similar circumstances. *See White v. Consolidated Planning, Inc.*, 603 S.E.2d 147, 155 (N.C. Ct. App. 2004) (finding allegations that "[b]ecause of [the Whites'] lack of expertise in financial affairs, they relied upon Robert White and Consolidated to properly manage their funds" were sufficient to plead breach of fiduciary duty claim). Plaintiff has alleged more than the simple debtor-creditor relationship that Defendants suggest. Additionally, this case is distinguishable from those such as *Broussard*, where there was no evidence to support the existence of any fiduciary duty independent of the contractual duties. 155 F.3d at 347.

Other courts applying the economic loss rule have concluded that it does not bar a breach of fiduciary duty claim where the fiduciary duty is not solely rooted in a contract. *See, e.g.*, *BlueEarth BioFuels, LLC v. Hawaiian Elec. Co.*, No. 09-00181, 2011 WL 563766, at *17-18 (D. Hawaii Feb. 8, 2011) (declining to apply economic loss rule under Hawaii law to bar breach of fiduciary duty claim where duty arose not only from contract but also from partnership principles codified by statute); *SCF Arizona v. Wachovia Bank, N.A.*, No. 09 Civ. 9513(WHP), 2010 WL 5422505, at *9-11 (S.D.N.Y. Dec. 14, 2010) (concluding under Arizona law that economic loss rule did not bar breach of fiduciary duty claim; "where a contract place[s] the parties in a relationship in which the law then imposes certain duties recognized by public policy, the gravamen of the subsequent action for breach is tort, not contract") (internal quotations and citation omitted); *Liberty Mut. Fire Ins. Co. v. Cagle's, Inc.*, No. 1:10-CV-2158-TWT, 2010 WL 5288673, at *3 (N.D. Ga. Dec. 16, 2010) (concluding under Georgia law that economic loss rule did not bar breach of fiduciary duty claim where a duty of care existed independent of the contract); *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 246-47 (Utah 2009) (concluding under Utah law that economic loss

17

rule did not bar breach of fiduciary duty claim). Furthermore, the fact that the Investment Agreements contain obligations similar to those of a statutory or common law fiduciary would not preclude Plaintiff's independent tort claim.

Finally, the Court is reluctant to deprive Plaintiff of a facially plausible claim, consistent with the pleading standards set forth in *Iqbal* and *Twombly*, at this early stage of the litigation without clear authority dictating such a result. The Court emphasizes that this is not an evaluation of the merits of Plaintiff's claims, but rather a determination that the facts alleged by Plaintiff, taken as true, are sufficient facts to state a claim to relief that is plausible on its face as required by *Iqbal* and *Twombly*.

Accordingly, because Plaintiff's breach of fiduciary duty claims have a source independent from the Investment Agreements, the breach of fiduciary duty claims are not barred by the economic loss rule and it is **RECOMMENDED** that Defendants' motion to dismiss the fiduciary duty claims be **DENIED**.

## ii. Fraud Claims (Counts V & VI)

Defendants contend that Plaintiff's claims for common law fraud and fraud in the inducement are barred by the economic loss rule because Plaintiff has failed to allege specific intent by Defendants to break their promises at the time they were made. Plaintiff counters that fraud and breach of contract claims may be pled concurrently under North Carolina law, that Plaintiff sufficiently pled specific intent not to perform as promised at the time the Investment Agreements were executed, and that Plaintiff's allegations are neither general nor conclusory.

Application of the economic loss rule to fraud claims in North Carolina courts has rendered varying results. *Compare Regions Bank v. Fairway Independent Mortg. Corp.*, No. 3:09CV534-DSC, 2010 WL 455045, at *4-5 (W.D.N.C. Feb. 2, 2010) (concluding that fraud

18

claim was not barred by economic loss rule where facts alleged in support of the fraud claim fell outside the contract), *with Coker v. DaimlerChrysler Corp.*, No. 01 CVS 1264, 2004 WL 32676, at *3 (N.C. Super. Ct. Jan. 5, 2004) (concluding that fraud claim was barred by economic loss rule where plaintiff sought to recover diminished value). The North Carolina Court of Appeals affirmed *Coker* on alternate grounds and specifically declined to address the issue of fraud claims and the economic loss rule. *Coker v. DaimlerChrysler Corp.*, 617 S.E.2d 306, 314 (N.C. Ct. App. 2005). However, Judge Hudson, dissenting in *Coker*, noted that the North Carolina appellate courts had not applied the economic loss rule to fraud claims and opined that the doctrine should not be so extended. *Id.* at 318. This Court has previously determined that it must look to the facts alleged to determine whether "[a]ccepting the allegations as true, they constitute more than an assertion that plaintiff failed meet its obligations under the contract, which 'does not support a tort action for fraud.'" *Food Lion, LLC v. Schuster Marketing Corp*., 382 F. Supp. 2d 793, 800 (E.D.N.C. 2005) (quoting *Strum*, 15 F.3d at 331) (Flanagan, C.J.).

The elements of fraud under North Carolina law are "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Food Lion*, 382 F. Supp. 2d at 797 (quoting *Ragsdale v. Kennedy*, 209 S.E.2d 494, 500 (1974)). In the present case, Plaintiff alleges the following facts relevant to his fraud claims: Defendants led Plaintiff to reasonably believe that the Option Strategy was conservative and safe, Pl.'s Am. Compl. ¶ 38; Defendants representations to Plaintiff regarding the Option Strategy did not properly disclose the specific and substantial risks involved, *id.* ¶¶ 42-44, 47-48; Plaintiff, in reliance on Defendants' misrepresentations regarding the conservative nature of the Option Strategy, executed the IMA, *id.* ¶ 49; Defendants fraudulently drafted, and Plaintiff executed, the

19

Investment Policy Statement, which did not accurately reflect Plaintiff's financial objectives, risk tolerance or investment history, *id.* ¶¶ 55-58; Defendants transferred 17,398 shares above what Plaintiff had authorized into the Trust Account, *id.* ¶ 76; Defendants failed to disclose to Plaintiff at their April 1, 2009 meeting the extent of Plaintiff's losses generated by the Option Strategy or the potential for substantial future losses, *id.* ¶ 78; Defendants failed to timely disclose to Plaintiff increasing substantial losses during the period from April 1, 2009 to May 29, 2009, *id.* ¶¶ 82, 90; Defendants led Plaintiff to believe that the situation could be managed consistent with the Option Strategy, when they, in fact, had no ability to predict or manage the risk of a price increase in RBC stock, *id.* ¶¶ 90, 103-04; Defendants misrepresented that Montione was an expert in conservative management of assets utilizing stock options, *id.* ¶ 105; Defendants created unauthorized overdrafts in the Trust Account, *id.* ¶¶ 111, 113-14; Defendants misrepresented to Plaintiff at a July 28, 2009 meeting the amount of losses realized year-to-date by the Trust Account, *id.* ¶ 115; Defendants fraudulently misstated facts with respect to the call options in the Trust Account being "at-the-money" or "in-the-money" in an attempt to recover the undisclosed financial losses, *id.* ¶¶ 119-124; Defendants actions in implementing the Option Strategy caused Plaintiff to lose $10,100 in dividend income for RBC stock, and Plaintiff would never have authorized the Option Strategy had Defendants disclosed that risk, *id.* ¶¶ 127-28; Plaintiff paid Defendant thousands of dollars in commissions that Defendants failed to properly disclose, *id.* ¶ 140; and as a result of Defendants material misrepresentations and omissions, Plaintiff was forced to borrow $2.3 million from Defendants to place in the Trust Account in order to limit further losses and to pay off the unauthorized overdraft, and sustained damages of approximately $2.2 million, *id.* ¶¶ 136, 141. In pleading his common law fraud claim, Plaintiff cites Defendants' failure to disclose the speculative nature of the Option Strategy, the

20

accumulating losses in the Trust Account, the ability of Defendants to mitigate or eliminate those losses, and the embezzlement and/or conversion of the trust funds. *Id.* ¶ 174.

In sum, Plaintiff has alleged that Defendants intentionally misled him as to the risk associated with the Option Strategy to induce him to invest with Defendants; that Defendants intentionally and repeatedly withheld information in an attempt to hide their wrongful actions, which thereby substantially increased Plaintiff's losses; that Defendants not only profited in the form of commissions and fees, but also from the substantial funds Plaintiff was forced to borrow from Defendants to avoid further losses; and that Defendants made unauthorized transactions and embezzled and/or converted funds in the Trust Account. The Court finds that the facts alleged are not conclusory, are sufficient to plead specific intent and to satisfy the requirements of Rule 9(b), and withstand scrutiny under *Iqbal* and *Twombly*. Further, the Court concludes that the allegations go beyond Defendants simply failing to perform under the contract and, therefore, the fraud claims are not barred by the economic loss rule.

Here, Plaintiff alleged that Defendants made misrepresentations regarding the Option Strategy prior to execution of the Investment Agreements, which induced him to enter into those contracts. Under similar circumstances, this Court in *Food Lion* concluded that the alleged fraudulent conduct was not confined to breach of the contract and declined to dismiss the fraud claim. *Food Lion*, 382 F. Supp. 800 ("[T]he action extends to wrongful behavior and knowingly false representations made by plaintiff prior to and during the formation of the contracts at issue, as an inducement upon which defendant relied in entering the contracts and further maintaining its relationship with plaintiff.") Likewise, in the case of *Capital Factors, Inc. v. The Fryday Club, Inc.*, the court concluded that allegations of deliberately misappropriated funds, failure to credit accounts, and failure to provide information were "obviously not within the scope of the

21

agreement." 209 F.Supp.2d 583, 585 (W.D.N.C. 2002). The allegations in *Capital Factors* are somewhat analogous to those in the present case:

> Fryday alleges that pursuant to the terms of the Fryday Club Agreement, Capital was required to document all transactions involving Fryday in an account dedicated exclusively to Fryday. Despite this requirement, Capital allegedly willfully, and with intention to deceive, transferred debts and transactions attributable to OTTO to the Fryday account. Capital allegedly also has withdrawn funds from Fryday's account without notice or justification, has not credited Fryday accounts for payments made by Fryday or its customers, has not provided defendants with account statements or other documentation regarding account activity, and has otherwise acted in a fraudulent manner.

*Id*. at 584. The court found that the allegations were not merely that "under the Fryday Club Agreement, Capital failed to meet its alleged obligations properly to account for, apply and handle certain transactions which occurred pursuant to the Fryday Club Agreement." *Id*. at 585; *see also Regions Bank v. Fairway Independent Mortg. Corp.*, No. 3:09CV534-DSC, 2010 WL 455045, at *4-5 (W.D.N.C. Feb. 2, 2010) (allowing fraud claims to proceed against defendant mortgage broker under independent tort exception where plaintiff bank "alleged scheme of intentional deception specifically designed to induce Plaintiff to loan $1,975,000.00 in the aggregate to [borrowers], for the sole purpose of enabling Defendant to collect its commission.")

Defendants essentially make the same argument here as the defendant in *Capital Factors*, that Plaintiff has merely alleged that Defendants breached their obligations to manage the Trust Account pursuant to the IMA. The Court disagrees. Similar to the plaintiffs' allegations in *Food Lion* and *Capital Factors*, Plaintiff here has alleged that Defendants made unauthorized transactions, including improperly disclosed payments of commissions and fees to itself, and material misrepresentations and omissions meant to hide significantly increasing losses from Plaintiff, which resulted in Plaintiff borrowing a substantial sum of money from Defendants. These allegations appear to go beyond what was contemplated by the IMA and may not be

22

sufficiently addressed by interpreting the terms of the IMA. *See Food Lion*, 382 F. Supp. 800 ("If proved, the allegations intimate the type of fraudulent scheme that could not be addressed by merely discerning the contractual obligations of the parties.").

The Court also finds it significant that Plaintiff alleges that the contract is unenforceable based on the fraudulent inducement and has pled his breach of contract claim, in the alternative, in the event the Court finds the Investment Agreements are valid and enforceable. Pl.'s Am. Compl. ¶¶ 190, 207. Further, the IMA does not limit Defendants' liability for special, consequential or punitive damages arising from intentional misconduct or fraud. Def.s' Mot. to Dismiss, Ex. B at 4 (DE-15-2). Therefore, allowing Plaintiff's fraud claims to proceed does not unduly expand the remedies available outside of a breach of contract claim in this case. In sum, the Court does not view this case as a "paradigmatic contract action" mandating application of the economic loss rule to Plaintiff's fraud claims. *See Central Transport Intern., Inc. v. General Elec. Co.*, No. 3:08CV136-C, 2008 WL 2669268, at *4 (W.D.N.C. June 27, 2008) (applying economic loss rule to bar tort recovery in action to recover damages for variance from contractual packaging requirements, which court characterized as "paradigmatic contract action").

Accordingly, the Court concludes that Plaintiff's fraud claims are within the independent tort exception and are not barred by the economic loss rule, and it is **RECOMMENDED** that the motion to dismiss the fraud claims be **DENIED**. Again, the Court emphasizes that this is not an evaluation of the merits, but rather a determination that the facts alleged by Plaintiff, taken as true, are sufficient to state a claim for relief that is plausible on its face as required by *Iqbal* and *Twombly*. *See Food Lion*, 382 F. Supp. 2d at 801 ("A decision as to whether defendant has provided sufficient evidence of such intent [beyond mere failure to carry out a promise in

23

contract] so as to submit this issue to a jury is premature. If proved, the alleged behavior here could constitute an independent tort. Nothing else is needed to survive a motion to dismiss under 12(b)(6).")

### iii.  Negligence Claims (Counts VIII, X & XI)

Defendants contend that Plaintiff's claims for negligent misrepresentation, negligence, and gross negligence implicate Defendants' duties under the contract and are barred by the economic loss rule. Plaintiff counters that his negligence claims fall within two of the four recognized exceptions to the economic loss rule: (1) That the injury, proximately caused by the promisor's negligent, or willful, act or omission in the performance of his contract, was loss of or damage to the promisee's property, which was the subject of the contract, the promisor being charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm, as in the case of a common carrier, an innkeeper or other bailee; and (2) That the injury so caused was a willful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor. *Fry Roofing*, 240 S.E.2d at 350-51.

As to the first exception, the North Carolina courts have declined to apply it absent a "public policy exception, as in the case of contracts involving a common carrier, innkeeper or other bailee." *Spillman v. Am. Homes of Mocksville, Inc.*, 422 S.E.2d 740, 741 (N.C. Ct. App. 1992). Furthermore, the case upon which this exception is based specifically involved a bailee. *Miller's Mut. Fire Ins. Ass'n of Alton, Ill. v. Parker*, 65 S.E.2d 341 (N.C. 1951), and Plaintiff has cited no cases where the exception has been applied outside of a bailor/bailee relationship. Accordingly, the Court finds that this exception does not apply to Plaintiff's negligence claims.

As to the second exception, the Court finds that Plaintiff has sufficiently alleged a claim for conversion, as discussed below, but that the exception appears to allow only the conversion

claim to survive and is not a basis for sustaining the negligence claims. The cases cited by the *Fry Roofing* court as the bases for this exception address conversion claims arising from a breach of contract. *See Fry Roofing*, 240 S.E.2d at 350-51 (citing *Williamson v. Dickens*, 27 N.C. 259 (1844); *Simmons v. Sikes*, 24 N.C. 98 (1841)). Plaintiff notes that the *Fry Roofing* court cited "numerous cases" where courts have allowed tort claims arising from negligent performance of a contract. However, Defendants correctly point out that the four exceptions articulated in *Fry Roofing* were derived from the cases to which Plaintiff refers and, therefore, do not create additional exceptions above and beyond the four *Fry Roofing* exceptions. 240 S.E.2d at 350.

The Court also notes that while the fraud claims may be construed as outside the contract, the negligence claims go directly to Defendants' performance of the contract, and North Carolina courts have strictly applied the *Fry Roofing* exceptions to negligence claims. *See Regions Bank*, 2010 WL 455045, at *4-5 (dismissing negligence claims as barred by economic loss rule where no *Fry Roofing* exception applied, but allowing fraud claims to proceed where plaintiff "alleged scheme of intentional deception specifically designed to induce Plaintiff to loan $1,975,000.00 in the aggregate to [borrowers], for the sole purpose of enabling Defendant to collect its commission.")

Accordingly, the Court finds that neither *Fry Roofing* exception raised by Plaintiff applies to his negligence claims, and it is **RECOMMENDED** that Defendants' motion to dismiss Plaintiff's negligence claims be **GRANTED**.

### c. Failure to Properly Plead Constructive Fraud (Count VII)

Defendants contend that Plaintiff improperly pled his constructive fraud claim by failing to allege that Defendants received a specific or definite benefit from him beyond ordinary fees or commissions. Plaintiff counters that he properly alleged that Defendants benefitted from (1) the

25

interest accrued on the $2.3 million loan Plaintiff borrowed from Defendants as a result of Defendants' wrongful actions and (2) the collection of fiduciary management fees, commissions, and quarterly management fees based on the value of the Trust Account.

"[T]o maintain a claim of constructive fraud, there must be an allegation that defendant sought to benefit himself." *NationsBank of North Carolina, N.A. v. Parker*, 535 S.E.2d 597, 602 (N.C. Ct. App. 2000) (citing *Barger v. McCoy Hillard & Parks*, 488 S.E.2d 215, 224 (1997)). In *NationsBank*, the court found that the ordinary fee collected by a notary when he notarized allegedly fraudulent signatures was not sufficient evidence that he sought to benefit himself in the transaction. 535 S.E.2d at 602. The Court reached this conclusion because "[t]here was no evidence that the amount paid defendant for notarizing and witnessing the loan documents would have been any different if the documents had not been forged." *Id.* Here, Defendants claim that they merely received a fee for work. The Court disagrees.

Plaintiff did not solely rely on Defendants' collected fees and commissions, but also alleged that Defendants benefitted from the interest accrued on the $2.3 million loan Plaintiff borrowed from Defendants as a result of Defendants' wrongful actions. This interest is not a fee for work and provides an additional basis for Plaintiff's constructive fraud claim. Plaintiff also alleged that absent Defendants misrepresentations and omissions, he would not have authorized the Option Strategy executed through the Trust Account and that if Defendants had made full and accurate disclosures earlier, he would have terminated the Trust Account, which would have eliminated or reduced the fees paid to Defendants. This distinguishes the present case from *NationsBank* where the fee was a single payment that did not involve continued payments based on the value of assets held in an account.

26

*Barger* is likewise distinguishable where the court concluded that the plaintiffs alleged no facts to show that the defendant accountants gained anything by negligently misrepresenting a corporation's financial condition or that plaintiffs would not have continued relationship had defendants provided different information. 488 S.E.2d at 224. Here, Plaintiff has alleged that he would have terminated the Trust Account had he received different information. Finally, in the case of *Sterner v. Penn*, cited by Defendants, the court found that an allegation that "defendants benefitted by earning commissions on the sales transactions ordered by Penn" was not sufficient *by itself* because it failed to show that "defendants sought to benefit themselves by taking unfair advantage of plaintiff[.]" 283 S.E.2d 670, 674 (N.C. Ct. App. 2003). In the present case, Plaintiff alleges that Defendants "took advantage of their position of trust to the hurt and detriment of Plaintiff" and "sought to benefit themselves financially by charging Plaintiff a substantial on-going quarterly management fee." Pl.'s Am. Compl. ¶¶ 194-95. This is more than what the plaintiff alleged in *Sterner*, where, additionally, the court found insufficient allegations to support a special duty because defendants did not act as investment advisors to plaintiff.

Accordingly, the Court finds that Plaintiff has alleged sufficient facts that, if taken as true, state a claim to relief that is plausible on its face, and it is **RECOMMENDED** that Defendants' motion to dismiss Plaintiff's constructive fraud claim be **DENIED**.

### d. Failure to Properly Plead Conversion (Count XIII)

Defendants contend that Plaintiff improperly pled his conversion claim by failing to allege facts that Defendants lacked authority over the Trust Account. Plaintiff counters that Defendants were not authorized to overdraft the Trust Account and, in doing so, made an unauthorized assumption and exercise of ownership rights over approximately $250,000 in

27

Plaintiff's assets. Under North Carolina law, conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 537 S.E.2d 248, 264 (N.C. Ct. App. 2000).

Plaintiff alleges two specific instances of conversion: (1) When Defendants purchased 21,800 shares of RBC stock on July 27, 2009 at a cost of $1,024,368.92 to cover the exercise of unauthorized call options sold by Defendants on May 5, 2009, which created an overdraft in the Trust Account of $231,836.02; and (2) When Defendants paid themselves a quarterly fiduciary fee of $16,029.94 for management of the Trust Account on July 15, 2009, which created an overdraft in the account. Pl.'s Am. Compl. ¶ 231. Defendants argue that these acts were authorized under the IMA, which provides in pertinent part:

> The Manager shall have absolute authority and discretion to place orders for the purchase and sale of securities on behalf of the Account, with such brokers and in such a manner as, in its reasonable judgment, offers the best price and execution of such transaction.
>
> . . . .
>
> Expenses incurred by the Manager in the performance of its services hereunder and all other proper charges and disbursements of the Account shall be charged to the Account by the Manager, unless otherwise directed by the client.

Def.s' Mot. to Dismiss, Ex. B, Art. I(f) & Art. VIII (DE-15-2).

With respect to the first provision, while it authorizes the manager to trade on behalf of the Trust Account, it does not expressly authorize the creation of debt in the account, which is the alleged conversion. With respect to the second provision, it again does not expressly authorize the creation of debt. Further, this provision authorizes "proper" charges and disbursements, and Plaintiff's claim is that these were not authorized, i.e., improper, charges. It

28

is not appropriate for the Court to weigh the merits at this stage, and the Court need only determine whether Plaintiff's allegations, if accepted as true, state a claim to relief that is plausible on its face. The Court finds that Plaintiff's allegations that Defendants made unauthorized overdrafts of approximately $250,000 in Plaintiff's Trust Account is sufficient to state a plausible claim for conversion under *Iqbal* and *Twombly*. Accordingly, it is **RECOMMENDED** that Defendants' motion to dismiss Plaintiff's conversion claim be **DENIED**.

## CONCLUSION

It is hereby **RECOMMENDED** as follows:

1. That Plaintiff's motion to remand for lack of diversity [DE-9] be **DENIED**;

2. That Plaintiff's alternative motion to join additional defendants and to remand [DE-9] be **DENIED**, and that the Clerk of Court amend the caption to substitute "Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association" for "Wachovia Bank, National Association"; and

3. That Defendant's motion to dismiss [DE14] be **GRANTED IN PART**, as to Plaintiff's claims for negligent misrepresentation, negligence, and gross negligence, and **DENIED IN PART** as to Plaintiff's remaining claims.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not

objected to, and accepted by, the District Court.

This the 28th day of February, 2011.

_____
DAVID W. DANIEL
UNITED STATES MAGISTRATE JUDGE